IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KIM HALLORAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11-cv-01028-DGK |
| | ) | |
| HOULIHAN'S RESTAURANTS, INC., and | ) | |
| BRIAN BARNES | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER GRANTING DEFENDANTS SUMMARY JUDGMENT</u>

This lawsuit arises out of Plaintiff Kim Halloran's ("Halloran's") employment at The Bristol Seafood Grill ("the Bristol") in Kansas City. Halloran alleges Defendant Houlihan's Restaurants, Inc., the owner of the Bristol, and Defendant Brian Barnes ("Barnes"), the Bristol's general manager, engaged in retaliation in violation of the Missouri Human Rights Act ("MHRA").[1] Defendants deny the allegations.

Now before the Court is Defendants' "Motion for Summary Judgment (Doc. 40) brought pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1. Finding that Halloran failed to timely file an administrative charge of discrimination with the Missouri Commission on Human Rights ("MCHR") within 180 days of any alleged retaliation, the Court GRANTS Defendants' motion.

**Summary Judgment Standard**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---
[1] Plaintiff's Petition also alleged sex discrimination and constructive discharge in violation of the MHRA. Defendant moved for summary judgment on these claims, and Plaintiff did not respond to these arguments in her suggestions in opposition (Doc. 47). By not responding to Defendants' arguments, Plaintiff has abandoned her sex discrimination and constructive discharge claims.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must evaluate the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.

**Factual Background**

For purposes of summary judgment, the Court finds the facts to be as follows. Properly controverted facts and facts immaterial to the Court's ruling have been omitted.

Defendant Houlihan's Restaurants, Inc. ("Houlihan's") owns and operates several restaurants, including the Bristol located at 51 East 14th Street in Kansas City, Missouri. Plaintiff Kim Halloran began her employment with Houlihan's in approximately 1996 and worked in its Leawood, Kansas location for three years before leaving. She resumed employment with Houlihan's in 2006 and transferred to the Bristol in January 2008 as a manager.

Defendant Brian Barnes is the Bristol's general manager and was Halloran's supervisor. The other managers who reported to Barnes were Corey Lee ("Lee"), Travis Napier ("Napier"), Ray Hanson ("Hanson"), James Masters ("Masters"), Patty Stoetzer ("Stoetzer"), Sarah June

("June"), and a manager in training. During the time Halloran worked at the Bristol, Lee worked as the dining room front house manager. Lee and Halloran were co-workers, neither had supervisory authority over the other.

Houlihan's has a "Policy Against Discrimination and Harassment" which forbids all types of discrimination. The policy defines discrimination and harassment and outlines the complaint procedure for employees to follow if they have been discriminated against or harassed. The policy specifically prohibits retaliation against any employee who makes a complaint.

Houlihan's has a separate policy prohibiting fraternization and romantic relationships between employees and their supervisors. As a manager, Halloran understood this policy and knew it was her responsibility to report any prohibited relationships to Louis Ambrose ("Ambrose"), Houlihan's Senior Vice President of Operations for Specialty Restaurants,[2] or to the Human Resources department. Halloran further understood that Houlihan's policies prohibited retaliation against a person who made a good-faith complaint of a violation of the policies.

Around September 2009, Halloran had concerns that Barnes, who was married, and Lee were having a romantic relationship. She believed certain interactions between the two—flirting, calling each other more at work, talking excessively with each other—"was starting to come across as unprofessional." Halloran did not know if Barnes and Lee were actually having an affair, but the work environment caused by Barnes' and Lee's relationship was uncomfortable, annoying, inappropriate, offensive, and distracting.

---

[2] Ambrose oversees fifteen restaurants for Houlihan's. His responsibilities, include, among other things, manager recruitment and development. Ambrose was Halloran's previous supervisor, and she has known him since 1996. Halloran believes Ambrose is a "nice guy" and "[k]ind of a father figure to everybody."

In November 2009, Halloran approached Barnes in the Bristol's office and told him that employees were making comments about Barnes and Lee, including joking, "if you can't find Brian, find Corey." Barnes listened to Halloran. A couple of days later, Halloran again approached Barnes and asked him what he wanted her to say if she heard any of the servers make comments. Barnes got mad at her and told her that he did not know why she was still talking about it.

Lee arguably received special treatment from Barnes which corroborated Halloran's suspicions. When Lee experienced a panic attack while at work in late November 2009, managers at the Bristol called Halloran and Barnes. Barnes came to the restaurant, finished Lee's shift, signed her name to various documents, and kept the incident a secret from Ambrose.

Instead of immediately reporting her concerns to Ambrose, Halloran tried to speak with other managers about the situation. One told her, "he didn't want to get involved in any of this."

Barnes' wife, Mrs. Barnes, began sending ten to twenty text messages per day to Halloran about the supposed relationship between Barnes and Lee. Barnes also began receiving a large number of phone calls at the restaurant, between twenty and thirty a day, from his wife and Lee.

After talking to other employees, Halloran sent a message to Ambrose on his cell phone on December 3, 2009 stating she needed to meet with him. They met the following day. Halloran shared her concerns that Barnes and Lee were having an inappropriate relationship. Halloran did not complain that Barnes was making sexual advances towards her. Ambrose appeared to take Halloran's concern seriously. Ambrose spoke to Barnes the next day on December 5th.

After meeting with Ambrose, Barnes got mad and called Halloran on her cell phone on her day off, yelling and cursing at her. Later that day, Halloran spoke directly with Mrs. Barnes and told her that she did not wish to discuss the issue anymore. Halloran told Mrs. Barnes she "didn't want to be in the middle of it anymore."

On December 6, 2009, Ambrose and Trenda Johnson ("Johnson"), Houlihan's Human Resources Manager, began investigating whether there was a romantic relationship between Barnes and Lee. As part of their investigation, Ambrose and Johnson spoke to Halloran. Halloran reported seeing Lee and Barnes sitting in an inappropriate posture where their legs were touching, but did not report seeing any other contact such as kissing, embracing, or other inappropriate touching. Ambrose met with approximately twenty other Bristol employees. Two indicated that Barnes and Lee spent quite a bit of time together in the office. No one else disclosed anything which indicated an improper relationship.

Ambrose met with Halloran and told her that Barnes and Lee were not having an affair. On December 17, 2009, Ambrose met with all of the Bristol's managers about the investigation. He told them they needed to work together as a team and stop talking about the matter. If they had any concerns, they should talk to him, but the unfounded rumors about Barnes and Lee had to stop. Ambrose indicated that if people continued to speak about the matter, "jobs were on the line." Halloran understood that Ambrose did not want anybody communicating with Mrs. Barnes about the matter. Halloran felt Ambrose threatened her job by saying "[t]hat if things were happening or we didn't like it, get out."

After the investigation, the environment in the restaurant became tense and awkward and worsened every day. Lee ostracized Halloran, and Barnes was awkward and angry. Halloran contends that after she complained to Ambrose in December 2009, she saw a negative monthly

5

review on the fax machine with her signature—indicating that she had approved it.[3] Halloran never received a demotion, a decrease in salary, change in benefits, or any change in job responsibilities after she complained to Ambrose about her concerns involving Barnes' and Lee's supposed relationship.

Halloran also alleges that after her December 4, 2009 complaint, she received an undesirable schedule including three or four closes per week. However, Houlihan's records, which Halloran acknowledges are accurate, show that Halloran was not scheduled to close more frequently after she made her complaint.

On January 8, 2010, Halloran sent Mrs. Barnes a message via Facebook stating, "I know we can't 'talk' about anything. I just want you to know I hope you are doing okay." Barnes believed Halloran was stirring the pot by communicating with his wife.

On January 29, 2010, Halloran sent an email to Barnes expressing frustration about the uncomfortable work environment in the restaurant. On January 30, 2010, Ambrose, Barnes, and Halloran met and discussed the email. Ambrose facilitated the meeting and reiterated the importance of working together as a team. Both Halloran and Barnes expressed that they both needed to come into work and focus on work. Halloran felt that Barnes was committed to moving forward and that he was not angry. At the same meeting, Ambrose and Barnes presented Halloran with her annual performance review. Barnes included many positive comments in it. He did not include anything that Halloran thought was unfair or retaliatory.

After her January 30, 2010 performance review with Barnes, Halloran "felt like everything was okay" until one evening in February 2010, when Barnes and Lee were at the Bristol. Halloran was closing that evening. Barnes and Lee were up at the bar and "everything

---

[3] The record does not indicate whether anyone else ever saw this fax or whether its contents were used in evaluating her.

seemed pretty good." After Barnes and Lee left, Mrs. Barnes came into the restaurant looking for them. A few seconds later, Ambrose came in to the restaurant. At that moment Halloran thought, "I can't keep dealing with this" and decided to resign.

In February 2010, Halloran requested a transfer. She spoke to Ambrose, identifying three other restaurants to which she wanted to transfer to be a general manager. At the end of February 2010, Halloran again asked Ambrose again about the possibility of transferring. Ambrose told Halloran he would get back to her. At the time of her request, there were no manager positions, much less a general manager position, available in any of the three restaurants Halloran identified. At the time Halloran sought a transfer, she never voiced any concerns to Ambrose that she felt her working conditions had become unbearable.

On about April 10, 2010, Halloran verbally gave Ambrose her two-week notice of resignation. She told Ambrose that she had accepted a management position at the Capital Grille in Kansas City, and she was excited about her new job. Halloran's last day of employment with Houlihan's was either April 25 or April 26, 2010.

Halloran testified as follows during her deposition about her treatment after she giving her notice:

> Q: How did [Barnes] treat you during the two-week notice period [after giving your notice]?
>
> A: Better than he had in three months.
>
> ***
>
> Q: Okay. So it would be fair to say between April 10th of 2010 and the time you left neither Corey Lee nor Brian Barnes treated you in a retaliatory, rude fashion?
>
> A: Yes.

7

Halloran filed her Charge of Discrimination with the MCHR on October 21, 2010, approximately 194 days after giving her notice of resignation.

## Discussion

The Court holds Defendants are entitled to summary judgment because Halloran failed to file an administrative charge with the MCHR within 180 days of the discriminatory act. A plaintiff asserting claims under the MHRA "must file an administrative charge with the MCHR within one hundred and eighty days of the discriminatory act and must bring a civil action no later than two years after the alleged cause occurred." *Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (Mo. Ct. App. 1999). "Any act of discrimination occurring outside this 180-day period is considered 'merely an unfortunate event in history which has no present legal consequences.'" *Id.* (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).

The 180 day period is tolled if the plaintiff can demonstrate she is the victim of an ongoing practice or pattern of discrimination by her employer. *Pollock*, 11 S.W.3d at 763. To establish the applicability of the continuing violation theory, a plaintiff must show (1) that at least one act of harassment or retaliation occurred within the filing period; and (2) that the harassment or retaliation is a series of interrelated events which continued into the limitations period. *Id.*

Halloran filed her charge of discrimination with the MCHR on October 21, 2010. Thus, in order for her administrative charge to be timely filed, some discriminatory conduct must have occurred on or after April 24, 2010. When a plaintiff provides notice of her intent to resign, the date of accrual—the date on which the 180 day period begins to run—is the date of the notice of the resignation, not the plaintiff's last day of employment. *Nichols v. Nat'l Ins. Co.*, 945 F. Supp. 1235, 1239 (E.D. Mo. 1996). Here, Halloran testified during her deposition that she gave

her notice on April 10, 2010 and that she did not suffer any retaliation after that date. Although Halloran points to other deposition testimony in which she complains her working conditions "got worse every day" after she initially complained to Ambrose, she cannot identify any retaliatory act that occurred after April 24th. As a result, the Court holds she cannot establish that she suffered harassment or retaliation during the 180 day period preceding her administrative charge; thus her MHRA claims are time barred.

## Conclusion

For the foregoing reason's, Defendants' motion is GRANTED.

**IT IS SO ORDERED.**

Date: July 3, 2013                             /s/ Greg Kays
                                               GREG KAYS, JUDGE
                                               UNITED STATES DISTRICT COURT